## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | | |
|---|---|---|
| CELESTINA LAMAI, | * | CIVIL NO. 4:23-cv-00105-SBJ |
| | * | |
| Plaintiff, | * | |
| v. | * | MEMORANDUM OPINION |
| | * | AND ORDER ON |
| CENTRAL IOWA HOSPITAL | * | DEFENDANT'S MOTION |
| CORPORATION d/b/a IOWA | * | FOR SUMMARY JUDGMENT |
| METHODIST MEDICAL CENTER, | * | |
| | * | |
| Defendant. | | |
| | * | |

### I. INTRODUCTION

Plaintiff Celestina Lamai alleges she was discriminated against because of her race and color while employed by defendant Central Iowa Hospital Corporation, d/b/a Iowa Methodist Medical Center. Now before the Court is Defendant's Motion for Summary Judgment (Dkt. 23). Defendant contends it is entitled to judgment as a matter of law under Federal Rule of Civil Procedure 56 on all claims. Lamai resists the motion contending there are genuine issues for trial. Dkt. 26. The Court held a hearing during which counsel presented oral argument and considers the matter to be fully submitted. For the reasons which follow, the motion is denied.

### II. LAMAI'S COMPLAINT

As set forth in an Amended Complaint, Lamai, who is Black, was employed by Defendant to work as a surgical technologist at Iowa Methodist Medical Center. Dkt. 12 ¶¶ 12, 13. She asserts the following factual allegations in support of her claims of employment discrimination:

> On April 1, 2022 Defendant assigned Lamai to assist with a surgery. As Lamai was preparing for the surgery, she was directed to leave the surgical room and was reassigned different job duties. Lamai was informed that she was directed to leave the surgical room and was reassigned to different job duties because of her race and/or her color. Defendant replaced Lamai in the surgery with a White person.

*Id.* ¶¶ 14-17. Lamai further alleges "she involuntarily resigned her position on April 12, 2022 because of Defendant's blatantly discriminatory actions" and contends "Defendant constructively discharged [her]." *Id.* ¶¶ 18-19. Lamai contends defendant's actions constitute unlawful discrimination in violation of the Iowa Civil Rights Act of 1965, Iowa Code ch. 216, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq.*, and 42 U.S.C. § 1981. *Id.* ¶¶ 20-46. Lamai demands a trial by jury and seeks damages for emotional distress, mental anguish, compensatory relief, and punitive damages. *Id.*

Defendant denies Lamai's allegations of race discrimination and claims for damages, and demands a trial by jury. Dkt. 13. In the motion before the Court, Defendant asserts it is entitled to summary judgment. Dkt. 23.

## III. STANDARDS FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial responsibility of identifying evidence "which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex Corp.*, 477 U.S. at 324).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a

genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At this stage, the court's function is not to determine credibility, weigh the evidence or determine the truth of the matter. *Id.* at 249, 255. Instead, the court views the record in the light most favorable to the nonmoving party and determines whether there is a genuine issue for trial. *Id.*; *see also Torgerson*, 643 F.3d at 1042.

## IV. FACTS WITHIN SUBMITTED RECORD

Celestina Lamai is a certified surgical technologist. She was assigned to work at Iowa Methodist Medical Center ("IMMC") in its surgical department by a third-party staffing agency from December 6, 2021 to June 18, 2022. Lamai is an experienced surgical technologist, qualified for her job, and considered a hard worker and pleasant to work with.

The position of a surgical technologist at IMMC included various duties such as preparing the operating room for procedures, ensuring instruments were available for the surgeon during the procedure, positioning patients, maintaining a sterile field, and assisting with clean-up and turnover of the room after a procedure. During her time at IMMC, Lamai assisted with a variety of procedures, including colorectal surgeries and cystoscopies, and was assigned to these various

surgeries by an operating room supervisor, Hollie Martinsen. Lamai's pay and benefits were not impacted by the room assignments or the types of procedures.

On Friday April 1, 2022, Lamai was assigned as the surgical technologist for a colorectal surgery with Dr. Molly Gross, who performs surgeries at IMMC but is not an employee of IMMC. Gross Dep. Tr. p. 14. Dr. Gross considered Lamai to be "very skilled at her job." *Id.* p. 12. According to Dr. Gross, while waiting in a pre-operation room, the patient said "'I hope there are only white people in the room,' or something to the effect of that." *Id.* p. 17. As explained by Dr. Gross during a deposition:

> I was so flabbergasted and just kind of taken aback that I said nothing to him. This is an elderly gentleman, at the end of his life, with a life-threatening condition that needed surgery to save him. I know that under duress people say things that they shouldn't say, don't mean, and I found it so, like, out of the -- I was so flabbergasted that I just didn't even know what to do, so I walked out of the room.

*Id.* pp. 18-19. Dr. Gross went to the front desk of the operating room area, repeated the patient's statement, and commented "Can you believe that he said this?" *Id.* pp. 19-20.

Hollie Martinsen was at the desk and heard Dr. Gross' comment. Martinsen Dep. Tr. p. 37. According to Martinsen, there was no one else at the desk at that time. *Id.* As testified during a deposition, Martinsen cannot remember exactly what Dr. Gross said: "I cannot recall word for word, but basically there was a racist comment made." *Id.* p. 38. Martinsen continued:

> [Dr. Gross] was upset. She was very upset that -- the conversation she had with her patient. She shared -- I can't remember word for word what was said. And I listened to her, and we had a conversation.

*Id.* pp. 38-39.

Martinsen went to the office of Laurie Johnson, who was the executive director of surgical services, and told her what had happened. *Id.* pp. 41-43. As explained during her deposition:

> I can't remember word for word what I said. But basically that a comment was made to Dr. Gross and that they didn't want any colored people, so I made -- I told her that I was going to switch [Lamai to another room].

4

*Id.* p. 44. Johnson did not refer Martinsen to any policies or procedures nor did she suggest to Martinsen that she take any particular steps.

During Martinsen's deposition, she was asked why she decided to switch Lamai out of her assigned room, to which she answered "I was protecting her" and further explained:

> The patient made a request. If something bad happened, the patient coded, the family get upset because she was there and – I was protecting her.

*Id.* pp. 44, 47. Martinsen acknowledged she would not have switched Lamai to a different room if she were White. *Id.* p. 45. Martinsen called into the operating room and directed the circulating nurse to switch Lamai into a room which had been assigned to Tammi Hentges, who is White, as the surgical technician. Martinsen did not discuss the matter with Lamai before doing so.

At that time, Lamai was preparing her assigned room for the next procedure and had gone to use the restroom. Lamai testified during her deposition as to the following subsequent events:

> I think I was gone for probably approximately 3 minutes. I came back to resume what I was doing by sorting through the supplies. As I was getting my hand in there to start -- to continue where I left, then Jaynah informed me that -- she was, like, "Oh, you have been reassigned to another room."
>
> So then I proceeded to ask her, I said, "Did I do anything wrong?" She was, like, "No, you didn't. Hollie had called into the room while you were gone saying that Dr. Gross told her that the patient said that they do not want a black person in the room, they want an all white team, so you have been asked to go switch with Tammi, who's in another room."
>
> * * *
>
> I simply did what I was told. I went into the next room.
>
> * * *
>
> I get into the room. I opened the door. The first person that sees me come into the room is Kimberly because she was a circulating nurse in the room. She was shocked. She was, like, "What are you doing here?" I'm, like, "I''ve been asked to switch with . . .Tammi because Dr. Gross said that the patient said they do not want a black person in the room. I was told I was kicked out of the room because I was black." . . . [Kimberly] stood up from her chair. She was, like, "I'm so sorry. We love you here" and she gave me a hug.
>
> * * *
>
> Then I proceeded to go talk to Tammi, who was standing by the doctor, because the procedure was already ongoing. I told her -- I tapped her on the back. I was, like, "I'm here to switch with you. I've been asked to replace you, for you to go to

5

> my room because they did not want me to participate in that surgery because I'm black."

Lamai Dep. Tr. pp. 46-49. The ongoing procedure in the room was a cystoscopy which, according to Lamai, "was almost at finishing" and probably lasted "less than 20 minutes." *Id.* p. 50. Lamai continued to work in the room assisting with cystoscopies the remainder of the workday. *Id.* p. 52.

Lamai described the differences in her duties for a colorectal surgery and cystoscopy as follows during her deposition:

> In a colorectal surgery, it's a very, very invasive surgery whereby the patient's abdomen is cut open and we work on the patient's intestine, which we call bowel, and that is a very – it's a sterile procedure where I assist the surgeon, passing instruments correctly, make sure that nobody contaminates any part of their gown, contaminates their hand to put it back in the patient, and I also help retract the tissue while the surgery is being performed. I also at the end when we're closing help, you know, cut sutures while closing.
>
> So for this particular surgery, a colorectal surgery, the surgeon cannot do it without a scrub person, either a surgical technologist or a scrub nurse in the role of a surgical technologist. Whereas in a cystoscopy surgery, it's considered a clean procedure. It's not considered a sterile procedure. Because we're going through the dirty part of the anatomy and going into the prostate or the bladder.
>
> So with that, not necessarily -- a surgical technologist does not have to scrub in with the doctor. Once the little table is set up, you put a camera and a scope there, you can push the table to the doctor, and the doctor just takes the camera and looks through the penis and looks into the prostate without the surgical technologist being a part of it.

*Id.* pp. 67-68. In Lamai's opinion, a colorectal surgery is one of the most difficult types of procedures for a surgical technician and a cystoscopy is the easiest procedure. *Id.* pp. 70-71.

While Lamai does not recall whether it was at the end of the day that Friday, or the following Monday, Lamai had a conversation with Martinsen she described as follows:

> I just recall her telling me that "Oh, I had to switch you out of the room with Tammi because the patient had requested that they did not want a black person as part of the team. They wanted an all white team." My response to her was "I can't believe there is people like that in the world."

*Id.* p. 75.

6

On Monday April 4, 2022 at 10:02 p.m., Lamai emailed Larie Barker, the manager of nursing services, to report the incident. The email indicated "Racial Discrimination" as the subject and stated as follows:

> Hi Larie,
>
> I hope this email finds you well. I write to bring to your attention about an occurrence that took place here at Methodist hospital on Friday April 1st of 2022.
>
> I was assigned to do a colorectal case with Dr. Molly Gross in room 8 with Jaynah and Mitzi. Prior to the case, Dr. Gross came into the room while we were turning over the room to prepare for her case to tell us specifics that she will require for her case, like how she'd would like the patient positioned and other stuff she would need for the surgery. When she left the room I quickly ran to the bathroom and on my return to the room, I was told by Jaynah that I have been reassigned to another room by the charge person in the front desk. I asked Jaynah if I have done anything wrong or rather the reason for the switch in rooms and assignment, she tells me that Hollie who is in charge at the front desk was informed by Dr. Gross that the patient does not want a colored (Black) person to be part of the surgical team. I went ahead and did what I was told by leaving the room. I was told to leave a room for which surgery I'm qualified and skilled to do because of the color of my skin. I have been a surgical technologist for the past 16 years and never in my career have I been told to leave a room not because I don't have the skills set to do the job, but because of the color of my skin. I have been emotionally traumatized by this event since Friday which makes it difficult and uncomfortable for me to perform my job at this Methodist hospital. I'm still emotionally traumatized as I write this, as to how a hospital that's an equal opportunity employer, skills based would let this happen. Thank you for your attention to this matter.

Dkt. 27 p. 4. Barker forwarded the email to Paige Green, who has the position of Business Partner in the Human Resources department.

Green and Barker started an investigation into the incident by interviewing Lamai on April 5, 2022 at 9:30 a.m. Green assured Lamai she would investigate the incident and circle back to her. Lamai indicated in her deposition there was nothing else she wanted Green to do at that time. Lamai Dep. Tr. p. 138. Green apologized to Lamai acknowledging the incident was not handled appropriately and thanked Lamai for bringing the situation to her attention. Green and Barker also interviewed Martinsen about the incident.

Defendant has a written "Diversity Commitment" policy which "supports and encourages inclusion and diversity in its work force." Dkt. 28 p. 89. The policy includes a flow chart, referred to as a "diversity algorithm," to follow if a patient demands reassignment for a discriminatory reason such as race. *Id.* pp. 90-91. Pursuant to the policy, a "leader" is to respond to the patient as follows:

> "What I am hearing you say is that you are upset and don't want _____ to care for you because of (Name the patient's discriminatory reason from the box above). At UPH-DM (name specific facility) we respect and honor the diversity of both our patients and our staff. Our most important goal is that you receive the highest quality of care possible. The way we do that is to hire the most qualified team members regardless of their (reason). While I am sorry that upsets you, I hope that you will agree that it is to your best interest to have the most qualified person take care of you regardless of (reason). Our hospital cannot and does not support discrimination in any way of any person. I cannot accommodate your request based upon the reason you described to me."

*Id.* p. 91. The "leader" is also to report to a "team member" as follows:

> "The patient has said to me they request reassignment based upon (discriminatory reason from the box above). I have informed the patient we respect the honor and dignity of our team members and do not support discrimination in any way and cannot accommodate their request. I wanted you to be aware of their request. We will continue this assignment unless **you** would choose to have a different assignment."

*Id.*

Neither Martinsen nor Barker were aware of or recall seeing the "Diversity Commitment" policy algorithm before the incident involving Lamai on April 1, 2022. Defendant admits its policy was not followed. Dkt. 29-1 p. 6. Martinsen was disciplined with a verbal warning for not following the policy's algorithm.

Following the interviews on April 5th, Green sent an email regarding the matter to Joyce McDanel, the Vice President of Human Resources, who forwarded it to the CEO, David Stark, on April 7th. In the forwarding email, McDanel stated "we . . . failed to protect [Lamai] from being discriminated against." Dkt. 29-1 p. 25. McDanel also sent an email to Green on April 7th wherein

she again stated, "we failed" to protect Lamai "from this form of discrimination." *Id.* pp. 25-26.

Lamai continued to work her scheduled shifts following the incident. But, according to Lamai, on April 12, 2022, she requested to have her contract ended and paid out for the rest of the contract because she no longer felt comfortable working there due to the racist incident. Lamai explained as follows during her deposition:

> I resigned because I could no longer work for a hospital that blatantly took me out of the room because I am black, and I could no longer focus on my job, and my mental was, and is, I could make a mistake that could end a patient's life, and I was very emotionally traumatized by the fact that even though I was qualified for the job that they hired me for, I was sent out of the room because I'm black.

Lamai Dep. Tr. p. 74. Lamai was paid on April 14, 2022 for the remainder of her contract through June 18, 2022.

Barker testified she "wasn't surprised, given the situation" when she heard Lamai did not want to continue to work at IMMC. Barker Dep. Tr. p. 78. She explained: "[I]t was very evident that [Lamai] was very bothered by the scenario and justifiably and that she felt like she didn't want to be in that environment." *Id.* pp. 78-79.

## V. ANALYSIS OF SUMMARY JUDGMENT MOTION

Lamai contends defendant's actions constitute unlawful race and color discrimination in violation of the Iowa Civil Rights Act of 1965, Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1981. Dkt. 12 ¶¶ 20-46. While similar, the text of each statute varies.

Pursuant to the Iowa Civil Rights Act ("ICRA"), it is unlawful for an employer "to discharge any employee, or to otherwise discriminate in employment against any applicant for employment or any employee because of the age, race, creed, color, sex, sexual orientation, gender identity, national origin, religion, or disability of such applicant or employee, unless based upon the nature of the occupation." Iowa Code § 216.6 (1)(a).

Under Title VII it is unlawful for an employer "to fail or refuse to hire or to discharge any

9

individual, or otherwise to discriminate against any individual with respect to [the individual's] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(1).

42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a). Section "1981 affords a federal remedy against discrimination in private employment on the basis of race," *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975), and such claims "are analyzed under the same framework as Title VII claims." *Collins v. Union Pac. R.R. Co.*, 108 F.4th 1049, 1052 (8th Cir. 2024).

Defendant contends it is entitled to judgment as a matter of law under Federal Rule of Civil Procedure 56 on the claims asserted under each statute. Dkt. 23. But the evidentiary record before this Court, when viewed in the light favorable to Lamai, establishes there are genuine issues for a jury to determine at trial.

"'To survive a motion for summary judgment on a race discrimination claim, a plaintiff must either present admissible evidence directly indicating unlawful discrimination, or create an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).'" *Carter v. Pulaski County Special Sch. Dist.*, 956 F.3d 1055, 1058 (8th Cir. 2020) (quoting *Macklin v. FMC Transp., Inc.*, 815 F.3d 425, 427 (8th Cir. 2016)); *see also Gipson v. Dassault Falcon Jet Corp.*, 983 F.3d 377, 380 (8th Cir. 2020) (employee "may use either direct or indirect evidence to support" race discrimination claim); *Findlator v. Allina Health Clinics*, 960 F.3d 512, 514 (8th

Cir. 2020) ("An employer is entitled to summary judgment on an employee's discrimination claim unless the employee (1) presents direct evidence of discrimination, or (2) creates a sufficient inference of discrimination under the *McDonnell Douglas* framework."); *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 902 (8th Cir. 2015) ("A plaintiff may defeat summary judgment by either offering direct evidence or creating an inference of unlawful discrimination.").

"Direct evidence contains a specific link between a discriminatory animus and the complained of employment decision, allowing reasonable fact finder to find the illegitimate criterion was the employer's actual motivation for the decision." *Gipson*, 983 F.3d at 380; *see also Findlator*, 960 F.3d at 514 ("Direct evidence consists of a specific link between a challenged decision and discriminatory animus."); *Schaffhauser*, 794 F.3d at 902 (Direct evidence shows "a specific link between the alleged discriminatory animus and the challenged decision."). Thus, "[t]o prove intentional discrimination through direct proof, a plaintiff must establish a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employer's decision." *Young v. Builders Steel Co.*, 754 F.3d 573, 577 (8th Cir. 2014) (internal quotation marks and quoted citations omitted).

The evidence presented to this Court irrefutably contains a specific link between Lamai's race and the complained of employment decision. It is undisputed Lamai's work assignment was changed because she is Black and was replaced with another employee who is White. In the words of Defendant's Vice President of Human Resources, "we . . . failed to protect [Lamai] from being discriminated against." A fact finder could reasonably conclude an illegitimate criterion motivated the decision to reassign Lamai to a different room. As such, Defendant is not entitled to summary judgment.

Notwithstanding the direct evidence of an illegitimate criterion for changing Lamai's work

11

assignment, Defendant insists it is entitled to judgment as a matter of law because it did not take an "adverse employment action" against Lamai. In doing so, Defendant relies on the burden-shifting framework from *McDonnell Douglas* which is applied in the absence of direct evidence of discrimination. *See Carter v. Atrium Hosp.*, 997 F.3d 803, 808 (8th Cir. 2021) ("Iowa courts have applied the *McDonnell Douglas* framework to ICRA claims at summary judgment when there is no direct evidence of discrimination."). But even assuming the analysis is appropriate here, the standard for establishing an "adverse employment action" as relied upon by Defendant was recently rejected by the United States Supreme Court.

The well-established *McDonnell Douglas* framework has been repeatedly utilized to analyze summary judgment motions, in the absence of direct evidence, on claims under Title VII, Section 1981, and ICRA:

> a plaintiff must first state a prima facie case of discrimination, which shifts the burden to the defendant to proffer a legitimate non-discriminatory reason for the challenged action. If the defendant presents a non-discriminatory reason, the burden shifts back to the plaintiff to demonstrate that the alleged reason was pretext for discrimination.

*Findlator*, 960 F.3d at 515 (internal citations omitted) (applying *McDonnell Douglas* framework to Title VII racial discrimination claim for summary judgment analysis); *see also*, *e.g.*, *Collins*, 108 F.4th at 1053 (Section 1981); *Atrium Hospitality*, 997 F.3d at 808-09 (ICRA); *Pulaski County*, 956 F.3d at 1058 (Title VII and Section 1981); *Banks v. Deere*, 829 F.3d 661, 665-66 (8th Cir. 2016) (Title VII and ICRA).

To establish a prima facie case for race discrimination, the employee must show: (1) the employee is a member of a protected class; (2) the employee was qualified to perform the job and met the employer's legitimate expectations; (3) the employee suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *See*, *e.g.*, *Yang v. Robert Half Int'l, Inc.*, 79 F.4th 949, 964 (8th Cir. 2023); *Atrium Hospitality*, 997 F.3d at 809;

*Pulaski County*, 956 F.3d at 1058; *Banks*, 829 F.3d at 666.

Here, in asserting it is entitled to summary judgment, Defendant focuses on the third element of the prima facie case and argues Lamai's "claims fail because she cannot prove Defendant took an adverse employment action against her." Dkt. 23 ¶ 15. Defendant relied upon the following language of the Court of Appeals for the Eighth Circuit in *Muldrow v. City of St. Louis*, 30 F.4th 680 (8th Cir. 2022):

> An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage. [M]inor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action.

*Id.* at 688 (quotation marks and citations omitted). Quoting the Eighth Circuit, Defendant asserted Lamai's "reassignment to perform a procedure, which she had performed before and was covered by her job description, for one partial shift, was, at most, a '[m]inor change[] in duties' that 'did not result in a diminution to her title, salary, or benefits' and did not cause a 'significant change in working conditions or responsibilities.'" Dkt. 23 ¶ 16 (quoting *Muldrow*, 30 F.4th at 688-89).

After submission of the parties' briefs in this case, the Supreme Court of the United States vacated the decision in *Muldrow* by the Eighth Circuit. *Muldrow v. City of St. Louis*, 601 U.S. 346, 353 (2024). Addressing the issue under an alleged violation of Title VII, the Supreme Court held the Eighth Circuit applied the wrong standard by requiring the employee "to show that the allegedly discriminatory transfer . . . produced a significant employment disadvantage." *Id.* at 359. Instead, the employee needs to "show only some injury respecting her employment terms or conditions. The transfer must have left her worse off, but need not have left her significantly so." *Id.* The Supreme Court reasoned:

> [Title VII's] language requires Muldrow to show that the transfer brought about some "disadvantageous" change in an employment term or condition. The words "discriminate against," we have explained, refer to "differences in treatment that

> injure" employees. Or otherwise said, the statute targets practices that "treat[ ] a person worse" because of sex or other protected trait. And in the typical transfer case, that "worse" treatment must pertain to—must be "with respect to"—employment "terms [or] conditions." § 2000e–2(a)(1). The "terms [or] conditions" phrase, we have made clear, is not used "in the narrow contractual sense"; it covers more than the "economic or tangible." Still, the phrase circumscribes the injuries that can give rise to a suit like this one. To make out a Title VII discrimination claim, a transferee must show some harm respecting an identifiable term or condition of employment.
>
> What the transferee does not have to show, according to the relevant text, is that the harm incurred was "significant." Or serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar. "Discriminate against" means treat worse, here based on sex. But neither that phrase nor any other says anything about how much worse.

*Id.* at 354-55 (internal citations omitted). *See Cole v. Group Health Plan, Inc.*, 105 F.4th 1110, 1114 (8th Cir. 2024) ("After *Muldrow*, [employee] is only required to plead 'some harm respecting an identifiable term or condition of employment.'") (reversing dismissal of religious discrimination claims under Title VII).

With the leave of Court, the parties submitted supplemental briefs addressing the opinion of the Supreme Court in *Muldrow*. Lamai asserts the Supreme Court expressly rejected the "materially adverse" argument upon which Defendant relies and confirms Defendant's actions violated Title VII and, under the same rationale, Section 1981 and ICRA. Dkt. 34 pp. 1, 3. In support, Lamai quotes the following excerpt from a concurring opinion in *Muldrow*:

> [T]he issue here is not complicated. Suppose that an employer says to an employee in the Columbus office: "We are transferring you to the Cincinnati office because you are black. But your compensation will not change." Does that violate Title VII? Of course it does. To begin with, the employer has treated the employee differently because of race. To be sure, the fact that a transfer may not involve a change in compensation can affect the amount of any damages . . . . But a transfer changes the terms, conditions, or privileges of employment. Therefore, a discriminatory transfer violates the statute.

*Id.* p. 2 (quoting *Muldrow*, 601 U.S. at 364 (Kavanaugh, J., concurring)). From the perspective of Lamai:

14

> It is undisputed that [Defendant] treated Lamai differently and worse because of race. Viewed in Lamai's favor, the record also shows that Lamai suffered some harm as a result of Defendant's discriminatory actions. The cystoscopy to which Defendant transferred Lamai is less complex than the colorectal surgery from which she had been removed and her role in the cystoscopy was much diminished in comparison. Additionally, Lamai suffered harm in that [Defendant's] conduct emotionally traumatized her and robbed her of the focus and professional confidence she had held prior to its discriminatory actions. Moreover, [Defendant's] directing Lamai to get out of the room because she is Black so that it could replace her with a white technician is blatantly "treating her differently because of race" in violation of Title VII, the ICRA and Section 1981 and is inherently harmful. Lamai has shown sufficient harm to meet the low bar of "some harm" under *Muldrow*.

*Id.* pp. 2-3 (internal citations omitted).

From Defendant's perspective, "*Muldrow* has lowered the bar for showing an adverse action, but not far enough to rescue [Lamai's] federal claims." Dkt. 35 p. 1. Defendant maintains "[i]t is harm—not different treatment—that remains the focus of the adverse action analysis." *Id.* p. 2. In Defendant's view:

> *Muldrow* did not hold that any and all different treatment might rise to the level of an adverse employment action under Title VII. The Court made clear that a plaintiff must show "some 'disadvantageous' change in an employment term or condition." In other words, the standard may no longer be significant harm, but it remains "harm." Harm is not synonymous with "change."

*Id.* p. 3 (internal citations omitted). In support, Defendant quotes the following excerpt from a different concurring opinion in *Muldrow*:

> The primary definition of "harm" is "physical or mental damage," and an "injury" is defined as "an act that damages, harms, or hurts: an unjust or undeserved infliction of suffering or harm." These definitions incorporate at least some degree of significance or substantiality. We do not typically say that we were harmed or injured by every unwanted experience. What would we think if a friend said, "I was harmed because the supermarket had run out of my favorite brand of peanut butter," or, "I was injured because I ran into three rather than the usual two red lights on the way home from work"?

*Id.* pp. 3-4 (quoting *Muldrow*, 601 U.S. at 363 (Alito, J., concurring) (internal citation omitted)). Defendant insists Lamai "suffered no harm with respect to an identifiable term or condition of her

15

employment." *Id.* pp. 4-7. In addition, Defendant asserts *Muldrow* has no impact on the claim of discrimination under ICRA or the viability of Lamai's constructive discharge theories. *Id.* pp. 7-8. Defendant requests that the Court grant its motion in its entirety and enter an order dismissing all of Lamai's claims.

Upon full consideration of the parties' submissions, evidentiary record, and arguments of counsel, Defendant has not established it is entitled to judgment as a matter of law as required under Rule 56. As previously noted, there is undisputed evidence directly indicating discrimination in this case: Lamai's work assignment was changed because she is Black and was replaced with another employee who is White. Again, Defendant's own Vice President of Human Resources referred to the incident as a "form of discrimination." It is therefore not necessary for Lamai to create an inference of discrimination under the *McDonnell Douglas* framework for her claims to survive summary judgment.

Even so, applying the *Muldrow* standard here, Lamai has sufficiently shown she suffered "some" injury or harm respecting her employment terms and conditions by being reassigned to another surgical room solely because she is Black. Stated simply: Lamai was treated worse because of her race. Contrary to Defendant's reference to the concurring opinion of Justice Alito, from this Court's view, Lamai's work reassignment because she is Black was not merely an "unwanted experience" equivalent to the supermarket being out of peanut butter or running "into three rather than the usual two red lights on the way home from work." Any such suggestion is misplaced and absent of merit. Ultimately, the extent of the injury or harm suffered by Lamai due to the actions of Defendant on April 1, 2022, whether minor or significant, is a matter for the jury as the finder of fact.

Accordingly, Lamai's claims of discrimination will proceed to trial under Title VII, Section 1981, and ICRA. It is unnecessary at this stage to address *Muldrow*'s impact on the claim of

discrimination under ICRA. The evidence before this Court is sufficient for all claims to survive summary judgment. Nor is it necessary to address the viability of Lamai's constructive discharge "theories" as challenged by Defendant given constructive discharge is not its own cause of action. The parties are not foreclosed to raise those matters at trial, if and when necessary.

## V. CONCLUSION AND ORDER

Defendant Central Iowa Hospital Corporation, d/b/a Iowa Methodist Medical Center has failed to establish it is entitled to judgment as a matter of law. Instead, based on the evidentiary materials submitted to this Court when viewed in the light most favorable to plaintiff Celestina Lamai, there are genuine issues for the jury to determine at trial. Defendant's Motion for Summary Judgment (Dkt. 23) is therefore denied.

IT IS SO ORDERED.

Dated September 24, 2024.

_____
Stephen B. Jackson, Jr.
Chief U.S. Magistrate Judge